UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
BENONI LENNOX DIXON and PAULINE
DIXON,

                                        Plaintiffs,                    **REPORT AND
                                                                      RECOMMENDATION**

                            v.
                                                                      CV 03-343 (DLI) (VVP)
CITY OF NEW YORK and SHARON
SWEETING-LINDSAY,
                                        Defendants.
-----------------------------------------------------------------x
POHORELSKY, Magistrate Judge:

        Judge Irizarry has referred to me for a Report and Recommendation, pursuant to 28

U.S.C § 636(b)(1), the defendants' motion for summary judgment in this employment

discrimination action.  The plaintiff[1] asserts two claims here, both of which are based on the

general theory that the defendants engaged in unlawful retaliation.  In one claim the plaintiff

focuses on specific retaliatory actions allegedly perpetrated by the defendants, in the other, he

alleges that the defendants subjected him to what is known as a "retaliatory hostile work

environment."  For the reasons discussed below, the undersigned respectfully recommends that

the motion be GRANTED in part and DENIED in part.

## BACKGROUND

        This matter involves a long and rather tumultuous employment relationship between the

plaintiff Benoni Dixon and the defendants.  The plaintiff was initially hired by the Department of

Corrections ("DOC") in May 1986 as a cook .  (Defs.' Rule 56.1 Statement ¶ 1; Pls.' Rule 56.1

Statement in Opp'n ¶ 1.)  A little more than a year later, in September 1987, DOC promoted the

_____

        [1]Unless otherwise indicated, references to "the plaintiff" in this Report and Recommendation
pertain to Benoni Dixon.  His wife, Pauline Dixon, sues only in a derivative capacity and does not figure
in the events that give rise to the claims at issue here.

plaintiff to the position of senior cook.  (Defs.' Rule 56.1 Statement ¶ 2; Pls.' Rule 56.1

Statement in Opp'n ¶ 2.)  Although he has not received any other promotions since then and was

employed in the same position at the time this suit was filed, the plaintiff has been transferred to

three different DOC facilities during his tenure as senior cook.  (Defs.' Rule 56.1 Statement ¶¶ 2-

3; Pls.' Rule 56.1 Statement in Opp'n ¶¶ 2-3.)  The first such facility was the George Motchan

Detention Center for Men ("GMDC") to which the plaintiff was transferred sometime in 1999.

(Defs.' Rule 56.1 Statement ¶ 4; Pls.' Rule 56.1 Statement in Opp'n ¶ 4.)

While at GMDC the plaintiff was involved in two disputes concerning allegations of

discrimination, both of which resulted in legal or administrative proceedings.  The first was a

lawsuit the plaintiff filed against DOC in the Southern District of New York for employment

discrimination on or around September 3, 1999.  That suit was eventually settled sometime in

November 2000.  (Defs.' Rule 56.1 Statement ¶ 5; Pls.' Rule 56.1 Statement in Opp'n ¶ 5.)  The

second involved a complaint filed by one of the plaintiff's colleagues, Ms. Myrleen Parris, on or

around May 23, 2000 with the Department of Correction's Equal Employment Opportunity

Office ("DOC EEO") alleging gender discrimination by the plaintiff.  (Defs.' Rule 56.1

Statement ¶ 6; Pls.' Rule 56.1 Statement in Opp'n ¶ 6.)  As part of its investigation into Parris's

complaint, DOC EEO requested that the plaintiff be transferred to another facility pending the

final outcome of its investigation.  (*See* Intradepartmental Memorandum, May 31, 2001, attached

to Klepfish Decl. Ex. C.)  Pursuant to this request the plaintiff was transferred to the Brooklyn

House of Detention for Men sometime between May 23, 2000 and June 6, 2000.  (Defs.' Rule

56.1 Statement ¶ 7; Pls.' Rule 56.1 Statement in Opp'n ¶ 7; *see also* Memorandum from Sharon

Sweeting-Lindsay to Benoni Dixon, Re: Immediate Emergency Transfer, June 5, 2000, attached

to Klepfish Decl. Ex. D.)  After its investigation, DOC EEO concluded in March 2001 that "insufficient evidence" existed to support Parris's initial allegation of gender discrimination but found, as part of the same investigation, that the plaintiff was responsible for creating a hostile work environment on the basis of gender, and recommended that his employment with DOC be terminated.  (Defs.' Rule 56.1 Statement ¶¶ 8-10; Pls.' Rule 56.1 Statement in Opp'n ¶¶ 8-10.) To date, DOC has not acted on the recommendations, nor has it taken any official action against the plaintiff in connection with Parris's complaint.  (Defs.' Rule 56.1 Statement ¶ 11; Pls.' Rule 56.1 Statement in Opp'n ¶ 11.)[2]

On or around July 24, 2001, the plaintiff filed another lawsuit against DOC in the Southern District of New York, this time alleging retaliation by the DOC because of the 1999 lawsuit he had brought.  (*See* Defs.' Rule 56.1 Statement ¶ 31; Pls.' Rule 56.1 Statement in Opp'n ¶ 31; *see also* Docket Sheet, *Dixon v. New York City Dep't of Corrections*, 01-CV-6736-LAP-KNF (S.D.N.Y. complaint filed July 24, 2001), attached to Klepfish Decl. Ex. Z.)  The plaintiff argued, as part of his July 2001 action, that the retaliation took the form of "false trumped-up charges," that had been filed against him by DOC EEO after its investigation into Parris' complaint.  He also asserted that the retaliatory acts were instigated by a Mr. Joseph Garcia who was employed by DOC as a "food service manager."  (*See* Mosaku Decl. Ex. D.)

---

[2]There appears to be a dispute as to the extent to which these charges were pursued; the plaintiffs assert that DOC EEO staff had spoken to several DOC employees in connection with the Parris complaint "as recently as October of 2003," while the defendants merely state that "[t]o date, DOC has not prosecuted the[] charges," contained in the memorandum of complaint.  (*See* Defs.' Rule 56.1 Statement ¶ 11; Pls.' Rule 56.1 Statement in Opp'n ¶ 11 (citing Am. Compl. ¶ 44).)  No dispute exists, however, that DOC did not subject the plaintiff to any official disciplinary action after the issuance of its findings and recommendations.  (Defs.' Rule 56.1 Statement ¶ 11; Dixon Aff. ¶ 86.)

The matter was voluntarily dismissed by the plaintiff on or around March 7, 2002 because of his "medical and financial situation." (Mosaku Decl. Ex. E.)

Sometime in mid-September 2001, DOC transferred the plaintiff to another facility, the George R. Vierno Center ("GRVC"), located on Rikers Island. (*See* Defs.' Rule 56.1 Statement ¶ 12; Pls.' Rule 56.1 Statement in Opp'n ¶ 12; *see also* Klepfish Decl. Ex. H.) A month or so into his new command at GRVC, the plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR"), alleging, in essence, that the transfer to GRVC, and the circumstances surrounding it, were in retaliation for complaints filed against DOC by the plaintiff himself, or by others with his assistance. (*See* Defs.' Rule 56.1 Statement ¶ 12; Pls.' Rule 56.1 Statement in Opp'n ¶ 12; *see also* Complaint, *Dixon v. City of New York*, No. 1324.2001, (NYSDHR Oct. 17, 2001), attached to Klepfish Decl. Ex. I.) NYSDHR forwarded the matter to DOC EEO which, after an investigation, concluded that the plaintiff's retaliation charges were "unsubstantiated." (*See* Defs.' Rule 56.1 Statement ¶ 15; Pls.' Rule 56.1 Statement in Opp'n ¶ 15; *see also* Memorandum from Patricia Gordon, Investigator, to Luis Burgos, Jan. 3, 2002, attached to Klepfish Decl. Ex. J.)

On March 5, 2002, the plaintiff had an encounter with the defendant, Sweeting-Lindsay, the details of which are relevant to the merits of the claims here and, not surprisingly, also the subject of sharp dispute.[3] What is undisputed, however, is that during this encounter, Sweeting-Lindsay asked the plaintiff, who at the time was attending a seminar at DOC's Training Academy, to sign a performance evaluation form that had been prepared by his supervisors at

---

[3]At that point and throughout the period relevant to the claims asserted here, Sweeting-Lindsay occupied the role of Deputy Executive Director of Operations for Nutritional Services at DOC and acted, at some level, in a supervisory capacity in relation to the plaintiff. (Am. Compl. ¶ 15; Dixon Dep. 48:1-11.)

DOC.  (Defs.' Rule 56.1 Statement ¶ 18; Pls.' Rule 56.1 Statement in Opp'n ¶ 18)[4]  The plaintiff refused to sign the evaluation form.  (Defs.' Rule 56.1 Statement ¶ 19; Pls.' Rule 56.1 Statement in Opp'n ¶ 19.)

Two days after the encounter, Sweeting-Lindsay sought to obtain an order of protection against the plaintiff from the Queens Criminal Court.  (Sweeting-Lindsay Dep. (Mosaku Decl. Ex. Z) at 118; *see* Mosaku Decl. Ex. D.) In an effort to obtain the order, she obtained copies of documents from the plaintiff's personnel file brought them to the court.  (Sweeting-Lindsay Dep. (Mosaku Decl. Ex. Z) at 125-29) No order of protection was ever issued and there is no evidence that the plaintiff was even aware of Sweeting-Lindsay's efforts to obtain one.  (*See* Mosaku Decl. Ex. D.)

On or around May 14, 2002, the plaintiff filed a complaint with NYSDHR alleging that DOC, particularly Sweeting-Lindsay, had retaliated against him for his filing of past complaints against DOC, and had also subjected him to discriminatory treatment.  (Defs.' Rule 56.1 Statement ¶ 23; Pls.' Rule 56.1 Statement in Opp'n ¶ 23; *see also* Complaint, *Dixon v. City of New York*, No. 16GA20380, (NYSDHR May 14, 2002), attached to Mosaku Decl. Ex. EE.) NYSDHR forwarded the complaint to DOC EEO for an investigation in which the March 5th encounter played a prominent role.  DOC EEO ultimately concluded that insufficient evidence existed to support the plaintiff's claims.  (Defs.' Rule 56.1 Statement ¶ 24; Pls.' Rule 56.1

_____

[4]Dated February 28, 2002 and entitled "Sub-Managerial Performance Evaluation," the evaluation covers the period between August 30, 1999 and August 30, 2000, and details numerous "tasks" apparently performed by the plaintiff and "standards" by which the performance of those tasks are judged.  (*See* Klepfish Decl. Ex. L.)  The form is signed by a supervisor, Frank Yearwood, and a reviewer, Daniel Seddo.  Out of a five-point scale, the plaintiff received a performance evaluation rating of either four or five on the tasks for which he was evaluated.  His "overall rating" was a four (again out five) or "very good."  In explaining why the plaintiff was not given a five, the reviewer expressed concern that the plaintiff had a "knack to instigate trouble within his own crew."  (*Id.*)

Statement in Opp'n ¶ 24; *see also* Memorandum from Leon C. Dimaya, NYSDHR Regional Director, June 21, 2002, attached to Kelpfish Decl. Ex. Q.)

In the present suit, the plaintiff rehashes his prior complaints of discrimination and retaliation based on factual allegations that are substantially similar to those underlying his past NYSDHR and DOC EEO claims. At its core, the matter deals with what the plaintiff alleges are retaliatory measures taken against him by the defendants in response to the numerous complaints and grievances he had filed against DOC, the initial spark being the September 1999 federal lawsuit that was eventually settled. These retaliatory measures manifested themselves in either specific instances of unfavorable treatment or the creation of a hostile work environment. The plaintiff alleges that the defendants' retaliatory activities violated various anti-employment discrimination statutes including 42 U.S.C. § 1981, 42 U.S.C. § 2000e *et seq.*, otherwise known as Title VII, and their New York analogues, namely, the New York State and City Human Rights Laws, *see* New York Executive Law §§ 290 *et seq.*; New York City Administrative Code §§ 8-101 *et seq.*

## DISCUSSION

### I.    Summary Judgment Standard

A motion for summary judgment will be granted when there is no material issue of fact to be decided and the undisputed facts warrant judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 1994). If a reasonable jury could return a verdict for the non-movant, then a material issue of fact remains in contention and the motion must be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The

materiality of the facts is determined by the substantive law governing the claims. *Id.* The

evidence offered in proof of the facts, however, must be " 'assess[ed] . . . in the light most

favorable to the non-movant and . . . [] all reasonable inferences [drawn] in [the non-movant's]

favor,' " *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quoting *Delaware &*

*Hudson Railway Co. v. Consol. Rail Corp.*, 902 F.2d 174, 177 (2d Cir. 1990)).

Courts apply a burden-shifting approach in deciding summary judgment motions.

The particular burden-shifting framework applied depends on "which party will bear the burden

of persuasion on the challenged claim at trial." *Celotex*, 477 U.S. at 331 (Brennan, J.,

dissenting). Where, as here, the non-moving party, bears the burden of persuasion at trial, *see*

*Holtz v. Rockefeller*, 258 F.3d 62, 81 (2d Cir. 2001) ("[T]he plaintiff's ultimate burden of

persuasion is the burden she bore from the outset – to persuade the trier of fact that she was the

subject of illegal discrimination.") (citations omitted); *Belfi v. Prendergast*, 191 F.3d 139, 140

(2d Cir. 1999) (stating that the plaintiff "at all times bears the ultimate burden of proof," as to

intent to discriminate for a Title VII claim), the moving party – here, the defendants – may

prevail on summary judgment in two ways:

> First, the moving party may submit affirmative evidence that negates an essential
> element of the nonmoving party's claim. Second, the moving party may
> demonstrate to the Court that the nonmoving party's evidence is insufficient to
> establish an essential element of the nonmoving party's claim. If the nonmoving
> party cannot muster sufficient evidence to make out its claim, a trial would be
> useless and the moving party is entitled to summary judgment as a matter of law.

*Celotex*, 477 U.S. at 331 (citations omitted).

It is important to note that in seeking to defeat summary judgment, a non-movant "cannot

rely on the allegations in his or her pleadings, conclusory statements, or on 'mere assertions that

affidavits supporting the motion are not credible.' " *Johnson v. County of Nassau*, 480 F. Supp.

2d 581, 593 (E.D.N.Y. 2007) (quoting *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)); *see also Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 155 (2d Cir. 2006) (" '[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment.' " (citation omitted). As the Second Circuit has emphasized, "[t]he time has come . . . 'to put up or shut up' " and those opposing summary judgment should be keenly aware that "unsupported allegations do not create a material issue of fact." *Weinstock*, 224 F.3d at 41 (quoting Fleming James, Jr. & Geoffrey C. Hazard, Jr., *Civil Procedure* 150 (2d ed.1977)) (additional citations omitted).

Courts should, however, exercise caution when deciding whether to grant summary relief in favor of an employer. More often than not the success or failure of a discrimination claim hinges on "the defendant's state of mind," which, as courts have consistently recognized, is not amenable to resolution on summary judgment. *Johnson*, 480 F. Supp. 2d at 593 ("Summary judgment is generally inappropriate where questions of the defendant's state of mind are at issue, and should thus be granted with caution in employment discrimination cases.") (citing *Gelb v. Bd. of Election of the City of New York*, 224 F.3d 149, 157 (2d Cir. 2000), *and Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994)) (additional citation omitted). That is not to say that summary judgment is never appropriate in employment discrimination matters. As the Second Circuit has reiterated not long ago, " 'the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to . . . other areas of litigation.' " *Weinstock*, 224 F.3d at 41 (quoting *McLee v. Chrysler Corp.*, 38 F.3d 67, 68 (2d Cir. 1994)) (additional citations omitted). There should be no mistaking then that, at the end, " 'summary judgment remains available to

reject discrimination claims in cases lacking genuine issues of material fact.' " *Johnson*, 480 F. Supp. 2d at 593 (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994)).

## II.     Application of Summary Judgment Standard

The two claims asserted by the plaintiff concern various retaliatory measures taken against him by the defendants for the complaints against DOC that he filed, or assisted others in filling, some of which were recounted above. The first claim addresses specific instances of alleged retaliatory acts while the second deals with a more general allegation of retaliation relating to what, in employment discrimination jurisprudence, is known as a retaliatory hostile work environment. The court deals with each claim in turn.

### A.     Retaliation Claim

#### 1.     Legal Standard

Title VII prohibits an "employer" from "discriminat[ing] against any of his employees . . . because he has [among other things] made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). Courts apply the well-established *McDonnell Douglas* burden-shifting framework when evaluating a claim of retaliation under section 2000e-3(a). *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003) ("The *McDonnell Douglas* burden shifting analysis used in claims of discrimination in violation of Title VII also applies to retaliation claims brought pursuant to Title VII.") (citing *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)); *Coffey v. Dobbs Intern. Servs., Inc.*, 170 F.3d 323, 326 (2d Cir. 1999) ("We utilize the well-known burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 [. . .] (1973), to analyze Coffey's retaliation claims under Title VII . . . .") (citation omitted). To

prevail on a Title VII retaliation claim the plaintiff, i.e., employee, must first establish a *prima facie* case by proving the following elements: "[1] participation in a protected activity known to the defendant;[5] [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action." *Terry*, 336 F.3d at 141 (citations and internal quotation marks omitted). If the plaintiff succeeds in establishing a *prima facie* case, the burden " 'shifts to the defendant to articulate a 'legitimate, nondiscriminatory reason' for its actions.' " *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir. 1991) (quoting *Taiit v. Chemical Bank*, 849 F.2d 775, 777 (2d Cir. 1988)). "Finally, should the defendant meet the burden of coming forward with a permissible reason for its actions, the plaintiff must then show that the reasons advanced were pretextual." *Id.* (citing *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)) (additional citation omitted).[6]

---

[5]"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (citing 42 U.S.C. § 2000e-3) (additional citation omitted). There is no dispute as to whether the plaintiff engaged in protected activities; as far as this court is aware, the plaintiff has been so engaged during the period in which he contends he was the subject of the defendants' alleged retaliatory actions.

[6]The plaintiff also brings retaliation claims, predicated upon the same factual allegations, under three other statutes: 42 U.S.C. § 1981(a) and the New York State and City Human Rights Laws, New York Executive Law § 296(e) and New York City Administrative Code §§ 8-107(7). Analysis of retaliation claims under those three statutes is governed by substantially the same burdens and standards as those employed in the Title VII context. *See Carrion v. Local 32B-32J Serv. Employees Intern. Union, AFL-CIO*, No. 03 Civ. 1896, 2005 WL 659321, at *10 (S.D.N.Y. Mar. 21, 2005) ("The framework for analyzing § 1981 claims, as well as claims under Section 296 of the New York State Human Rights Law and Section 8-107 of the New York City Human Rights Law, is essentially the same as that applied to claims arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*") (collecting cases); *accord Moore v. Consolidated Edison Co. of New York, Inc.*, No. 00 Civ. 7384, 2007 WL 831807, at *5 (S.D.N.Y. Mar. 20, 2007) ("On motion for summary judgment, employment discrimination claims brought under Title VII, 42 U.S.C. § 1981, and New York State and City statutes are analyzed under identical standards.") (citations omitted); *Khan v. Abercrombie & Fitch, Inc.*, 35 F. Supp. 2d 272, 276 n.2 (E.D.N.Y.,1999) (Glasser, J.) ("Plaintiff has brought race discrimination claims under Title VII and §1981 – this Court uses the same legal standards to evaluate both."). The court's analysis as to the Title VII claims therefore apply with equal force to those claims brought under the other three statutes.

The main points of contention concerning the retaliation claim relate to the second and third elements of the *prima facie* test set forth above. The defendants argue that none of the alleged retaliatory acts identified by the plaintiff constitute "adverse employment actions" under the second step of the test; they also contend that even if some of such conduct pass muster under the second element the plaintiffs still fail to establish the necessary causal causation demonstrating that these acts are the product of a retaliatory animus.

### a.    Adverse Employment Actions

In determining what constitutes an adverse employment action under the second prong of the *prima facie* test it is instructive to begin with the recent Supreme Court opinion of *Burlington Northern & Santa Fe Railway Co. v. White*, --- U.S. ---, 126 S. Ct. 2405 (2006), which refined, and to some extent revamped, the landscape of Title VII anti-retaliation law. Prior to *White*, and at least within this circuit, a plaintiff alleging retaliation had to prove that he suffered a " 'materially adverse change' in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (citations omitted).[7] In many ways this standard tracked the one applied to claims brought under Title VII's general anti-discrimination provision, 42 U.S.C. § 2000e-2(a). *Kessler v. Westchester County Dep't of Social Servs.*, 461 F.3d 199, 207 (2d Cir. 2006) ("We have adopted this standard in several cases addressing claims of ADEA- and Title VII-prohibited retaliation.") (citing *Fairbrother v. Morrison*, 412 F.3d 39,

---

[7]Courts applying the pre-*White* standard in determining what constitutes a "materially adverse change" focused on so-called " 'ultimate employment decisions,' " *White*, 126 S. Ct. at 2414 (citation omitted), such as " 'a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation,' " *Galabya*, 202 F.3d at 640 (citation omitted). Along the same lines, allegations pertaining to "a change in working responsibilities" that results in, for example, " 'a mere inconvenience or an alteration of job responsibilities,' " did not suffice for purposes of a retaliation claim prior to *White*. *Id.* (citation omitted).

56 (2d Cir. 2005), *and Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir. 1999)).

As the Second Circuit recently observed, however, "the Supreme Court announced a different standard [in *White*]." *Kessler*, 461 F.3d at 207. *See also White*, 126 S. Ct. at 2414 ("We therefore reject the standards applied in the Courts of Appeals that have treated the anti-retaliation provision as forbidding the same conduct prohibited by the anti-discrimination provision and that have limited actionable retaliation to so-called 'ultimate employment decisions.' ") (citation omitted). The *White* court made clear "that Title VII's substantive provision and its anti-retaliation provision are not coterminous," 126 S. Ct. at 2414, and "the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment," *id.* at 2412-13 (citation omitted). Thus, a plaintiff seeking to prevail on a retaliation claim under *White* need only "show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Id.* at 2415 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (additional citation and internal quotation marks omitted). With this, the *White* Court, in some ways, loosened the standard previously applied to retaliation claims in this circuit. As Justice Breyer, writing for a near-unanimous *White* majority, observed,[8] "[i]nterpreting the anti-retaliation provision to provide broad protection from retaliation helps assure the cooperation upon which accomplishment of the Act's primary objective depends." *Id.* at 2414. Thus, "[w]e phrase the standard [used to address retaliation claims] in general terms

---

[8]Justice Alito concurred in judgment. *See id.* at 2418.

because the significance of any given act of retaliation will often depend upon the particular circumstances." *White*, 126 S. Ct. at 2415. Courts evaluating retaliation claims under Title VII must guard against "employer interference with 'unfettered access' to Title VII's remedial mechanisms" – a task that, in the words of the *White* court, is best accomplished "by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEO,' the courts, and their employers." *Id.* (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)). In short, "[c]ontext matters" and " '[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.' " *Id.* (quoting *Oncale*, 523 U.S. at 81-82).

Yet the *White* standard is still a rigorous one and courts must bear in mind that "an employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* at 2415 (citation omitted). It is for that reason, the *White* court explained further, that "we speak of *material* adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth 'a general civility code for the American workplace.' " *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)) (additional citation omitted).

### b. Causation

The third and last element of the *prima facie* test for Title VII retaliation requires that the plaintiff show a causal connection between the protected activity engaged in by the plaintiff and the alleged adverse employment action carried out by the defendants in retaliation for

participation in such activity. *Terry*, 336 F.3d at 141. There are two ways this can be accomplished: "[1] *indirectly*, by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or [2] *directly*, through evidence of retaliatory animus directed against a plaintiff by the defendant." *DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987) (citations omitted).

As to indirect proof of causation by temporal proximity, courts have consistently found that "temporal proximity in the absence of other evidence is often insufficient to establish a *prima facie* case of retaliation." *Collette v. St. Luke's Roosevelt Hosp.*, No. 99 CIV. 4864, 2002 WL 31159103, at *8 (S.D.N.Y. Sept. 26, 2002) (citations omitted). Indeed, the Supreme Court has ruled in the Title VII retaliation context that plaintiffs who resort solely to temporal proximity in proving causation must demonstrate the existence of a time frame that is " 'very close.' " *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)) (additional citations omitted).

### 2.    Analysis

The plaintiff identifies retaliatory acts arising from various events as follows: first, the investigation and disciplinary charges brought by DOC as a result of Parris' May 2000 complaint; second, his allegedly unjustified and abrupt transfer to another correctional facility in September 2001; third, the excessively close scrutiny and monitoring he was subjected to by Sweeting-Lindsay; and finally, the March 2002 efforts by Sweeting-Lindsay to coerce his signature on his performance evaluation and to obtain an order of protection against him. (Pls.' Mem. of Law in Opp'n Summ. J. ¶ 24(g).)

### a.   DOC EEO's Charges Stemming From Parris' May 2000 Complaint

The plaintiff does not make clear in his submission what exactly is retaliatory about Parris's complaint and the charges ultimately filed against him in relation to that complaint. As construed by the court, however, the plaintiff appears to argue that Parris' May 2000 complaint of gender discrimination provided a platform for retaliation against him in two ways. First he argues that the disciplinary charges DOC EEO filed against him after its investigation were "trumped up, unfounded, and baseless," and were improper because he was charged with creating a hostile work environment on the basis of gender even though DOC EEO found that Parris's complaint of gender discrimination was unsubstantiated. Second he argues that he was retaliated against when the hostile work environment charges were "publicized" to three other individuals at DOC.

As an initial matter, the court rejects any suggestion that the mere commencement of the investigation into Parris's complaint constitutes actionable retaliatory conduct. To conclude otherwise would mean that an employer would essentially be prevented from investigating complaints of discrimination made against an employee who is engaging, or has recently engaged, in some form of protected activity. Nor, for the same reason, should a plaintiff be able to argue that the bringing of disciplinary charges against the plaintiff as a result of such an investigation, without more, constitutes retaliatory conduct merely because the plaintiff himself has a pending complaint of discrimination against someone else. *See Fol v. City of New York*, No. 01 Civ. 1115, 2003 WL 21556938, at *9 (S.D.N.Y. July 9, 2003).

In recognition that, to make a *prima facie* showing of retaliation, he needs to show more than merely the bringing of disciplinary charges against him, the plaintiff contends that the

charges were "trumped up" and "baseless." To be sure, such conduct may, post-*White*, amount to an adverse employment action. In *Malone v. City of New York*, No. CV-05-2882, 2006 WL 2524197, at *8 (E.D.N.Y. Aug. 30, 2006), Judge Trager, applying the *White* standard, found that "[b]eing subject to false charges before an administrative tribunal constitutes material adversity." In support, he cited various negative consequences that may result from having to respond to such charges, including attendance at hearings, hiring attorneys, and the possibility of demotions or terminations, which, when considered together could deter a reasonable employee from again engaging in protected activity. *Id.*

The *Malone* case was decided on the motion to dismiss level, however, where all allegations, including the one concerning the false nature of the charges, were taken as true. *Malone*, 2006 WL 2524197, at *3. Here, while the plaintiff makes a similar allegation, he provides no evidence to support this assertion, which he must do in contesting a motion for summary judgment. The hostile work environment charge ultimately leveled against the plaintiff is well-supported by the DOC EEO's investigatory files that were submitted as part of the record. (*See* Klepfish Decl. Ex. E.) The plaintiff has provided no concrete proof – for example, in the form of affidavits by individuals whose statements were made part of DOC EEO's investigatory file – to demonstrate that the charges filed against him were contrived in some way or based on shoddy evidence.[9]

---

[9]The defendants argue that the DOC EEO charges do not constitute a retaliatory measure as a matter of law because the plaintiff never suffered any actual consequences as a result of the charges such as a decrease in pay, suspension, or termination. This would perhaps have been a viable argument pre-*White* when the question whether disciplinary charges constituted acts of retaliation was answered by an examination of the ultimate, practical effects of the charges. This approach is no longer followed. *See Malone*, 2006 WL 2524197, at *7 n.1 ("The requirement that an adverse employment action affect the terms and conditions of employment does not apply

To the extent the plaintiff argues that the investigation itself was somehow flawed and thus led to allegedly false charges, such a claim is similarly unsupported by the record. While he points to numerous supposed shortcomings in the investigation (*see* Dixon Aff. ¶¶ 10-14), the plaintiff has offered no basis for concluding that DOC EEO's investigatory methods were in any way unauthorized or that the investigation of the Parris complaint was conducted differently from any other complaint. Nor does he offer any evidence that the bringing of disciplinary charges based on conduct separate from, but related to, the discriminatory conduct initially complained of somehow deviates from DOC EEO's normal policies and procedures.

Summary judgment on the allegation of "trumped up" and "baseless" charges is also warranted because the plaintiff fails to establish the necessary causal connection between the protected activity engaged in by him – here, the filing of a September 1999 federal action against DOC – and the adverse employment action, which, as indicated above, is DOC EEO's leveling of charges against him. As to *direct* proof of causation, which requires a showing of retaliatory animus, *see DeCintio*, 821 F.2d at 115 (citations omitted), the plaintiff offers only conclusory statements, asserting that the Parris complaint was filed for a "discriminatory purpose," which included an attempt to "uncover information that would be used to justify an adverse employment action against," him "and in retaliation for [his] having filed the . . . action against the DOC and others on September 3, 1999." (Dixon Aff. ¶ 12.) The plaintiff, however, points to no evidence to support this assertion.

Without evidence of a retaliatory animus then, the plaintiff must prove causation indirectly, i.e., through temporal proximity, which he also fails to do on the present record. As

---

to retaliation claims under Title VII.") (citing *White*, 126 S. Ct. at 2415).

indicated above courts generally find reliance on temporal proximity alone insufficient for purposes of proving causation unless the time gap at issue is "very close." *Breeden*, 532 U.S. at 273-74 (internal quotation marks and citations omitted); *Collette*, 2002 WL 31159103, at *8 (citations omitted). On the present record, the temporal range of nearly a year-and-a-half is much too long to support a finding of causation for a Title VII retaliation claim.[10] *See Breeden*, 532 U.S. at 274 (finding 20-month time period insufficient) (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (3-month time period insufficient), *and Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (4-month time period insufficient)); *Miller v. Batesville Casket Co.*, No. 02-CV-5612, 2007 WL 2120371, at *12 (E.D.N.Y. July 23, 2007) ("[C]ourts have determined that adverse employment actions taken one and one-half months after the protected activity is sufficient, while more remote adverse actions are not.") (citations omitted).

Finally, as to the plaintiff's allegation that he was retaliated against when DOC EEO allegedly "publicized" the disciplinary charges it had filed against him, the court finds summary judgment warranted on this point as well. Of the three individuals to whom these charges were allegedly disclosed, the plaintiff offers no evidence that such disclosure was unjustified. Nor can he. As the record makes clear, the three individuals who the plaintiff complains should not have received notice of the charges filed against him were all in positions or roles where such notification would have been reasonably expected if not required. (*See* Mosaku Decl. Ex. DD.) Two of the individuals, Paulette Johnson, the Executive Director of Nutritional Services, and

---

[10]This is arrived at by using the protected activity date of September 1999 and the adverse employment action date of March 22, 2001, when the plaintiff was served with the charges stemming from Parris' complaint. (*See* (Defs.' Rule 56.1 Statement ¶ 5, 10; Pls.' Rule 56.1 Statement in Opp'n ¶ 5, 10; Klepfish Decl.Ex. G.)

Jorge Ocasio, the Warden at GMDC, worked at DOC as high-level officials and acted in a supervisory capacity in relation to the plaintiff. The other recipient, Parris, was the complainant, and, as testified to by Luis Burgos, the DOC EEO official responsible for informing her of the charges filed against the plaintiff, it was not unusual for DOC EEO to provide complainants with information as to the disposition of their allegations, including whatever "improper conduct" the subject of the complaint was ultimately charged with. (Burgos Dep. 72:16-73:3.) The plaintiff has no evidence to raise a factual dispute concerning Burgos's testimony. Summary judgment is therefore warranted.

### b.      Transfer to Another DOC Facility

As another alleged retaliatory act, this one in response to the filing of his July 2001 federal lawsuit against DOC, the plaintiff points to his transfer around September 2001 to another DOC facility on what he argues was short notice. The *White* court has emphasized that "reassignment of job duties is not automatically actionable," and the extent to which it does constitute actionable conduct "depends upon the circumstances of the particular case." 126 S. Ct. at 2417. Here, the record is devoid of evidence as to what adverse effect the transfer may have had on the plaintiff inside or outside the employment context. There is no indication that the plaintiff's responsibilities were diminished or his rank demoted because of the transfer, two potential effects which the Second Circuit, applying the *White* standard, has viewed as critical elements in determining whether a work-related transfer is materially adverse to deter a similarly situated, reasonable employee from filing future complaints, thus amounting to actionable retaliatory conduct. *See Kessler*, 461 F.3d at 209-10 ("From this evidence, a rational factfinder could permissibly infer that a reasonable employee in the position of [the employee-plaintiff]

could well be dissuaded from making a charge of discrimination if doing so would result in a transfer to an office in which, *inter alia*, he would not be allowed to perform the broad discretionary and managerial functions of that position, no one would report to him, and he would be forced to do work normally performed by clerical and lower-level personnel.").[11]

Nor does the record bear any indication as to how the plaintiff himself might have been adversely affected by what he argues is the short notice associated with the transfers or even the transfers themselves. Even if he could offer such proof, however, it is an open question whether it would be sufficient to constitute a materially adverse change. *See Sibilia v. Snow*, No. 05-10096, 2006 WL 2990479, at *7 (D. Mass. Oct. 20, 2006) (finding that a denial of transfer which resulted in an increased a commuting time for plaintiff-employee was not materially adverse under *White* standard). The court need not decide that point now, however, since the record is devoid of any such evidence and thus fails to create a genuine issue of material fact.

## C.     Excessive Monitoring and Scrutiny

Next, the plaintiff identifies as retaliatory conduct the excessive monitoring and scrutiny to which he argues he was subjected after complaining about various instances of DOC-related discrimination. Other than conclusory statements, however, the plaintiff offers no proof to support this allegation. The sole specific instance of retaliatory scrutiny identified by the plaintiff relates to his March 5th encounter with Sweeting-Lindsay; he argues that the only

---

[11]*Cf. Williams v. City of New York*, No. 99 CV 2697, 2006 WL 266821, at *21 (E.D.N.Y. Sept. 11, 2006) (applying *White* standard and finding as actionable situation where plaintiff-employee was transferred from working at a "teacher's cafeteria" to the "student cafeteria" which amounted to a demotion and resulted in a loss of pay); *Singh v. U.S. Sec. Assocs.*, No. 05 Civ. 5333, 2006 WL 2460642, at *5 (S.D.N.Y. Aug. 10, 2006) (applying *White* standard and finding as actionable allegation of retaliation in which the plaintiff-employee was transferred to a new building, requiring him to "re-qualify for that position.").

reason Sweeting-Lindsay knew the plaintiff was attending the training seminar at which she gave him the evaluation form was because she was placing him under excessive scrutiny. This, however, does nothing to support the plaintiff's claim; the most such an allegation demonstrates is that Sweeting-Lindsay sought out the plaintiff for a particular purpose rather than, as the plaintiff seems to contend, having engaged in a constant monitoring effort.

Furthermore, the law in this circuit, including the little that exists post-*White*, is clear that an employer's excessive scrutiny of an employee without more fails to satisfy the requirements for an adverse employment action. *See Constance v. Pepsi Bottling Co. of New York*, No. 03-CV-5009, 2007 WL 2460688, at *36 n.15 (E.D.N.Y. Aug. 24, 2007) (expressing doubt, in light of *White* standard, that "surveillance on the job" would constitute an adverse employment action) (citations omitted); *Meder v. City of New York*, No. 05-CV-919, 2007 WL 1231626, at *4 (E.D.N.Y. Apr. 27, 2007) (finding "excessive scrutiny" does not constitute adverse employment action) (citing *Nicastro v. Runyon*, 60 F. Supp. 2d 181, 186 (S.D.N.Y. 1999)); *Montgomery v. Chertoff*, No. 03-CV-5387, 2007 WL 1233551, at *12 (E.D.N.Y. Apr. 25, 2007) (finding that " '[e]xcessive scrutiny, without more, does not constitute an adverse employment action") (citations omitted); *Scott v. Cellco P'ship*, No. 98 CIV 7245, 2007 WL 1051687, at *2 (S.D.N.Y. Apr. 3, 2007) (reconsidering previous order in light of *White* and declining to alter previous conclusion that "excessive scrutiny" does not constitute adverse employment action). The defendant is therefore entitled to summary judgment on this aspect of the plaintiff's claim of retaliation.

### d.    The March 2002 Incident Involving Sweeting-Lindsay

The final acts of alleged retaliation of which the plaintiff complains emanate from his encounter with Sweeting-Lindsay in March 2002 during which, according to the plaintiff's account, he was threatened and intimidated by Sweeting-Lindsay for refusing to sign a performance evaluation form that she presented to him while he was attending a training seminar.[12] As the court understands it, the adverse and thus actionable aspects of the encounter are that (1) the evaluation form at issue was "doctored, altered and [a] composite", (2) Sweeting-Lindsay physically accosted and verbally threatened the plaintiff when he was unwilling to sign the form the moment it was presented to him, and (3) Sweeting-Lindsay thereafter sought an order of protection against him through false statements and improper use of documents from his personnel file.

The court rejects at the outset the plaintiff's contention that the evaluation at issue had been somehow doctored or altered. The plaintiff has provided no evidence to support that assertion, nor does the evaluation form submitted as part of the record – a photocopy, not the original – bear any indications that would plausibly support the plaintiff's claim (see Mosaku Decl. Ex. M). There is no proof that the evaluation was created outside of standard DOC procedures. Even if it was altered, the plaintiff has produced no evidence that the evaluation or any alteration of the evaluation in any way affected any aspect of his employment. The

---

[12]While certain aspects of the factual record are unclear as to when the evaluation was prepared and the specific periods it covered – the evaluation at issue covered the plaintiff's performance between August 30, 1999 to August 30, 2000 at GMDC, yet the plaintiff was transferred out of GMDC around June 5, 2000 (Klepfish Decl. Exs. D, L) – there does not appear to be any dispute that the evaluation itself was prepared in response to a request by NYSDHR around February 2002 for its investigation into the plaintiff's October 2001 complaint. (Klepfish Decl. ¶ 2K, Ex. K; Dixon Aff. ¶ 63; Sweeting-Lindsay Dep. 71:23-81:17; Dixon Dep. 75:10-76:6.)

evaluation itself is not negative – out of a five-point grading system with five being indicating superior performance, the plaintiff received an average rating of four.[13]

The other two allegations relating to the encounter, however, present a closer call. The circumstances in which the form was presented to the plaintiff, as reflected in the record, raise questions of fact as to whether Sweeting-Lindsay acted in manner that would have dissuaded a reasonable employee in the plaintiff's position from engaging in protected activity. Of particular note is the plaintiff's allegation that after he refused to sign the form because he wanted to review it first, Sweeting-Lindsay physically accosted him and threatened him by telling him her

_____

[13]*See Valenti*, 2006 WL 2570871, at *10 (citing as a reason for dismissing retaliation claim the undisputed fact that the evaluation, overall, "was positive and favorable."); *Evans v. City of New York*, No. 00 Civ. 4197, 2003 WL 22339468, at *11 (S.D.N.Y. Oct. 14, 2003) (rejecting, pre-*White*, plaintiff's claim of retaliation based on negative performance evaluations finding the "ratings can hardly be characterized as 'negative' " and also that "positive evaluations that are not as positive as previous performance evaluations do not constitute adverse employment actions.") (citations omitted).

Even if the court were to accept the plaintiff's contention that the evaluation was negative, courts have uniformly found, pre- and, significantly, post-*White*, that negative evaluations, by themselves, do not constitute adverse employment actions for Title VII retaliation purposes; rather, at a bare minimum the plaintiff must show that he received a negative evaluation and that the evaluation negatively impacted his employment in some way – something that is absent from the present record. *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 756 (2d Cir. 2004) (*pre-White* case; rejecting plaintiff's argument that negative performance evaluation constituted adverse employment action when "she offered no proof that this evaluation had any effect on the terms and conditions of her employment."); *Holder v. City of Yonkers*, No. 04 CIV 10314, 2006 WL 1582081, at *6 (S.D.N.Y. June 7, 2006) (pre-*White* case; "Although the Second Circuit has explained that '[l]esser actions such as negative employment evaluation letters may . . . be considered adverse,' and that 'pecuniary emoluments' are not the *sine qua non* for establishing an adverse employment action, such negative employment evaluations must be accompanied by other adverse consequences to the terms and conditions of the Plaintiff's employment in order to qualify as an adverse employment action.") (citations omitted); *Carmellino v. Dist. 20 of New York City Dep't of Educ.*, No. 03 Civ. 5942, 2006 WL 2583019, at *32 (S.D.N.Y. Sept. 6, 2006) (post-*White* case; "After *Burlington Northern*, Judge Rakoff reconsidered a grant of summary judgment to an employer and concluded that no reasonable jury could find that a Title VII plaintiff's negative job evaluations met the Supreme Court's arguably broader standard due to the absence of 'evidence in the record that any negative consequences resulted from those evaluations.' ") (quoting *Jackson v. City Univ. of New York*, 2006 U.S. Dist. LEXIS 43338, at *3 (S.D.N.Y. June 26, 2006) (additional citation omitted); *Valenti v. Massapequa Union Free Sch. Dist.*, Nos. 03-CV-1193, 04-CV-5271, 2006 WL 2570871, at *9 (E.D.N.Y. Sept. 5, 2006) (post-*White* case; "Negative evaluations, without any accompanying adverse consequences are not adverse employment actions.") (collecting cases).

husband "would be waiting for him after work on the roof." (Mosaku Decl. Ex. II.) Such a threat, if true, is certainly not part of the "trivial harms" that fall beyond the scope of Title VII, *see White*, 126 S. Ct. at 2415, and, when assessed under the more lenient *White* standard, may constitute a situation where an employee facing such a threat would be reasonably deterred from making additional complaints.[14]

The question whether Sweeting-Lindsay's attempt to obtain an order of protection through the unauthorized use of documents taken from the plaintiff's personnel file constitutes a materially adverse event is a harder question. Had she been successful, that would certainly be the type of conduct that might deter a reasonable employee in the plaintiff's position from making complaints in the future. In addition, because she was unsuccessful, the plaintiff suffered no adverse consequence and indeed there is no evidence in the record that he was even aware of her attempt. Moreover, on the present record it is an open question as to whether Sweeting-Lindsay was prohibited from making copies of documents from the plaintiff's personnel file without prior authorization and for the purpose of applying for an order of protection; her deposition testimony on that point is, at best, unclear, and, for the most part, evasive. (Sweeting-Lindsay Dep. 125:9-128:21.) Nevertheless, because the attempt to obtain an order of protection through the unauthorized use of personnel documents may at least be probative of retaliatory intent in the factual context presented here, evidence concerning the attempt is likely to be presented to the jury whether or not the attempt itself constitutes a

---

[14]Sweeting-Lindsay of course sharply disputes the plaintiff's version of the encounter, contending that she merely left the evaluation form with the plaintiff without having engaged in any kind of discussion with him (Sweeting-Lindsay Dep. 90:18-91:24, Apr. 20, 2004, Mosaku Decl. Ex. Z). A written statement by one of the plaintiff's colleagues who was present at the time of the encounter described it as not being "a confrontational or hostile situation." (Mosaku Decl. Ex. II)

materially adverse event. Because the court has concluded that the encounter itself presents material issues of fact that defeat the defendants' motion for summary judgment, the court need not decide now whether the attempt to obtain an order of protection through allegedly improper means constitutes a separate act of retaliation.

The court recognizes that the causal connection between allegedly retaliatory acts relating to the March 5, 2002 encounter and any protected activity by the plaintiff is not particularly well-established. The plaintiff contends that the Sweeting-Lindsay's conduct was in retaliation for his filing of charges with NYSDHR in October 2001 relating to his abrupt transfer to the GRVC in September 2001. The connection is strengthened, however, by the fact that the charges of discrimination made by the plaintiff on that occasion related directly to Sweeting-Lindsay because it was her directive that led to the transfer, and she had been required to submit an affidavit in defense of her decision. Moreover, the decision rejecting the plaintiff's charge of discrimination had been handed down only two months before the March 5 incident giving some support to the notion that the charge was still fresh in Sweeting-Lindsay's mind. Although not strong, the evidence of causal connection is sufficient to withstand a judgment as a matter of law.

In sum, the court recommends that summary judgment be granted on the plaintiff's retaliation claims to the extent they rely on allegations concerning (1) the DOC EEO investigation and disciplinary charges stemming from Parris's May 2000 complaint; (2) the plaintiff's transfer; and (3) excessive scrutiny, but denied as to Sweeting-Lindsay's conduct during and immediately after the March 5th encounter.

## B.    Retaliatory Hostile Work Environment

In addition to his claim of retaliation, the plaintiff alleges that he was subjected to a retaliatory hostile work environment, pointing specifically to the March 5th encounter with Sweeting-Lindsay to substantiate his claim.[15]

While uncommon, courts have recognized claims of retaliation in which the underlying adverse employment action is the creation of a hostile work environment.  *See, e.g.*, *Nugent v. St. Luke's/Roosevelt Hosp. Ctr.*, No. 05 Civ. 5109, 2007 WL 1149979, at *12 (S.D.N.Y. Apr. 18, 2007) ("A hostile work environment may constitute an adverse employment action in the context of a retaliation claim.") (citing *Thomas v. iStar Fin., Inc.*, 438 F. Supp. 2d 348, 365 (S.D.N.Y. 2006)); *Baloch v. Norton*, 355 F. Supp. 2d 246, 261 (D.D.C. 2005) (finding "a claim of retaliation based on hostile work environment" a "cognizable claim."); *Friday v. City of Portland*, No. Civ.00-278-JE, 2005 WL 189717, at *5 (D. Or. Jan. 26, 2005) ("A plaintiff may establish a retaliation claim by showing that a retaliatory hostile work environment existed.") (citing *Ray v. Henderson*, 217 F.3d 1234, 1245 (9th Cir.  2000)); *Brodetski v. Duffey*, 141 F. Supp. 2d 35, 48 (D.D.C. 2001) ("Hostile work environment claims more frequently accompany Title VII gender, race or national discrimination than retaliation claims.  Nevertheless, there is little reason that a claim of hostile work environment should not be considered in cases of retaliation as well.").  Rather than apply the traditional Title VII retaliation standard, however, courts consider so-called retaliatory hostile work environment claims under the rubric generally reserved for construing pure hostile work environment claims.  Success or failure of the

---

[15]For this claim, the plaintiff relies only on the encounter itself and not Sweeting-Lindsay's attempt to obtain an order of protection shortly thereafter.

retaliatory hostile work environment claim therefore hinges not so much on whether the plaintiff can make out the *prima facie* case outlined above but whether he can prove the existence of a hostile work environment. *See Nugent*, 2007 WL 1149979, at *12.

To establish the existence of a hostile work environment the plaintiff must show that " 'the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive environment.' ' " *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) (citations omitted).[16]  This requires an examination of "all the circumstances" which includes both " 'objective and subjective elements' " such that " 'the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive.' " *Id.* (citations omitted); *see also Salerno v. City Univ. of New York*, No. 04-CV-3535, 2007 WL 22170609, at *10 (S.D.N.Y. Feb. 23, 2007) (citations omitted).  Some factors courts look to in making this determination include " 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance.' " *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

The law in this circuit is clear that "[i]solated incidents typically do not rise to the level of a hostile work environment unless they are 'of sufficient severity' to 'alter the terms and conditions of employment as to create such an environment.' " *Demoret v. Zegarelli*, 451 F.3d

---

[16]Even if the plaintiff proves the existence of a hostile work environment, he must still "demonstrate a specific basis for imputing the conduct creating hostile work environment to the employer" to prevail on his hostile work environment claim.  *Id.* (citing *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002)).  Because the court ultimately concludes that the plaintiff has failed to prove that he was subjected to a hostile work environment it need not reach the second step.

140, 149 (2d Cir. 2006) (quoting *Patterson County of Oneida*, 375 F.3d 206, 227 (2d Cir. 2004)).

Thus, "episodic" incidents are typically not actionable; rather, " 'they must be sufficiently

continuous and concerted in order to be deemed pervasive.' " *Id.* (quoting *Alfano*, 294 F.3d at

374). That is not to say, however, that a "single act" cannot result in a finding of a hostile

workplace where the event " 'work[s] a transformation of the plaintiff's workplace.' " *Feingold*,

366 F.3d at 150 (quoting *Alfano*, 294 F.3d at 374).

> As the Circuit stated in *Terry,*
>
> While the standard for establishing a hostile work environment is high, we have repeatedly cautioned against setting the bar too high, noting that "[w]hile a mild, isolated incident does not make a work environment hostile, the test is whether 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*.' "

336 F.3d at 148 (citations omitted); *accord Feingold*, 366 F.3d 150.

> Thus, as the *Terry* court continued,
>
> The environment need not be "unendurable" or "intolerable." Nor must the victim's "psychological well-being" be damaged. In short, " 'the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious of cases.' "

336 F.3d at 148 (citations omitted); *accord Feingold*, 366 F.3d 150.

Applying these principles the court concludes that the plaintiff has failed to establish the

existence of a hostile work environment on the basis of a solitary incident involving Sweeting-

Lindsay. While courts in this circuit do recognize the existence of a hostile work environment

on the basis of a single act, the cases also make clear that to prevail the act complained of must

be "sufficiently egregious." *See Lewis v. State of Connecticut Dep't of Corrections*, 355 F.

Supp. 2d 607, 622 (D. Conn. 2005) ("The prototypical 'single incident' that creates a hostile

work environment usually involves a clear, expressed, overt, and truly egregious act of discrimination."); *see, e.g.*, *Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 136 (2d Cir. 2001) (finding a "single incident of rape" can result in a hostile work environment). Here, the most the plaintiff can demonstrate in support of his retaliatory hostile work environment claim is a verbal threat coupled with perhaps a brief physical encounter in which the plaintiff alleges Sweeting-Lindsay grabbed his arm in order to get at the evaluation forms she had asked the plaintiff to sign.[17] The fact that the plaintiff took off for a six-month medical leave following the incident because of what he alleges were psychological ailments he developed after the exchange with Sweeting-Lindsay is as the Supreme Court has made amply clear only one factor to be considered in determining whether the plaintiff has been subjected to a hostile work environment. *Harris*, 510 U.S. at 22 ("The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required."); *see also Cohen v. Litt*, 906 F. Supp. 957, 963-64 (S.D.N.Y. 1995) (Sweet, J.) ("While a victim's subjective perception that a work environment is abusive is necessary to finding a Title VII violation, such a perception is not in itself sufficient.") (citation omitted). The plaintiff has failed to demonstrate in almost all other objective aspects that the mostly fleeting yet memorable encounter with Sweeting-Lindsay whom, notably, he had never met in person before then (Dixon Dep. 48:23-25), rose to the level of such severity that it

---

[17]It should be noted that allegations relating to the physical element of the encounter are of questionable veracity having not been reported by the plaintiff until he filed a police report on March 27th (Mosaku Decl. Ex. O), 22 days after the incident, and despite ample opportunity to do so – aside from the internal complaint filed with Commander Felton, the plaintiff filed a claim for worker's compensation based on the March 5th encounter which also bore no mention of being physically accosted by Sweeting-Lindsay (Mosaku Decl. Ex. N).

transformed the plaintiff's work environment into one that was objectively hostile. Summary judgment should therefore be granted in the defendants' favor on the retaliatory hostile work environment claim.

      **C.**    **Individual Liability Under Title VII, Section 1981, and New York State and City Human Rights Laws As To Defendant, Sweeting-Lindsay**

The defendants contend that summary judgment is warranted as to the Title VII claims asserted against Sweeting-Lindsay in her individual capacity as well as those brought under the New York State and City Human Rights Laws. The plaintiff does not appear to dispute this at least to the extent the Title VII claims are concerned.

In interpreting Title VII, the Second Circuit has made clear that individual liability is not available under the statute. This interpretation was first posited in *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995) ("We now hold that individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII."),[18] and has been consistently applied to other cases emanating from this circuit to justify the dismissal of Title VII claims against individual defendants, *see, e.g.*, *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) ("[T]he district court's dismissal of plaintiff's Title VII claims against Gallagher in his personal capacity must be affirmed because under Title VII individual supervisors are not subject to liability."); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 74 (2d Cir. 2000) ("In *Tomka* . . . we held that individuals may not be held personally liable under Title VII

---

[18]Although rather complex in its analysis, the Circuit's conclusion in *Tomka* that individual liability is not available under Title VII is based on its interpretation that Title VII was only meant to apply to employers in their institutional rather than individual capacities. *See id.* at 1313-17 ("In particular, we find that the statutory scheme and remedial provisions of Title VII indicate that Congress intended to limit liability to employer-entities of fifteen or more employees.").

of the Civil Rights Act of 1964, 42 US.C. § 2000e.”); *Bowles v. New York City Transit Auth.*, No. 00 Civ. 4213, 2006 WL 1418602, at *10 (S.D.N.Y. May 23, 2006) (“. . . I also note that Bowles's Title VII retaliation claim must be dismissed, as it is well-settled that individuals are not subject to liability under Title VII.”) (citations omitted); *Demilo-Fytros v. City of Mount Vernon*, 993 F. Supp. 221, 225 (S.D.N.Y. 1998) (relying on *Tomka* and dismissing Title VII claims against individual defendants).  Accordingly, the court recommends that summary judgment in favor of the defendants be granted on all Title VII claims asserted against Sweeting-Lindsay in her individual capacity.

Two other sets of claims – one under 42 U.S.C. § 1981, the other under the New York State and City Human Rights Laws – are directed at Sweeting-Lindsay in her individual capacity which the court addresses here.  Unlike Title VII, these statutes allow for individual liability. The Second Circuit in *Whidbee* made clear that “individuals may be held liable under § 1981.” 223 F.3d at 75.  The same goes for the state and city human rights laws.  *See Briggs v. Mercedes-Benz Manhattan, Inc.*, No. 04 Civ. 7094, 2006 WL 2789927, at *10 (S.D.N.Y. Sept. 27, 2006) (“Under both New York State Human Rights Law and New York City Human Rights Law, there may be individual liability . . . .”) (citation omitted).

Individual liability under these three statutes is not automatic, however.  The test to establish individual liability differs between section 1981 and the state and city-based laws, but they all require, in essence, some proof of personal involvement in the discriminatory acts by the individual against whom personal liability is sought.  For individual liability under section 1981, the Second Circuit requires that “a plaintiff . . . demonstrate ‘some affirmative link to causally connect the actor with the discriminatory action.’ ” *Whidbee*, 223 F.3d at 75 (quoting *Allen v.*

*Denver Pub. Sch. Bd.*, 928 F.2d 978, 983 (10th Cir. 1991)). At bottom, the court looks to the extent of the " 'actor's personal involvement' " before personal liability may be imposed under section 1981. *Id.* (quoting *Allen*, 928 F.2d at 983) (additional citation omitted).

It is undisputed here that Sweeting-Lindsay was personally involved in an encounter with the plaintiff which he alleges constitutes an instance of unlawful retaliation. The plaintiff alleges that during this encounter Sweeting-Lindsay confronted the plaintiff for the purpose of having him sign a performance evaluation form and that, when he refused, threatened the plaintiff. The court is therefore satisfied that Sweeting-Lindsay may be held individually liable under section 1981.

The test for individual liability under both the New York State Human Rights Law and New York City Human Rights Law is similar to that for section 1981 and requires proof that the defendant against whom personal liability is sought "actually participate[d] in the conduct [that gave] rise to a discrimination claim." *Tomka*, 66 F.3d at 1317 (citation omitted); *accord Briggs*, 2006 WL 2789927, at *10 (citation omitted). The allegations regarding the encounter between the plaintiff and Sweeting-Lindsay, as recounted above, provide sufficient proof of actual participation on the part of Sweeting-Lindsay such that she may be personally liable under the state and city human rights laws.

In sum, summary judgment as to the individual defendant, Sweeting-Lindsay, should be granted as to the Title VII claim but denied as to all other claims.

### D.     Loss of Consortium Claim Brought by Pauline Dixon

Pauline Dixon, the plaintiff's wife, asserts a claim for loss of consortium. Under New York law such a claim is derivative in nature and therefore cannot exist independently. *See*

*Mohamed v. Marriot Int'l, Inc.*, 905 F. Supp. 141, 158 (S.D.N.Y. 1995) (citations omitted). It may, however, be brought "pursuant to such primary common law torts as negligence," as is generally the case. *Goldman v. MCL Cos. of Chicago, Inc.*, 131 F. Supp. 425, 427 (S.D.N.Y. 2000) (citations omitted). The complaint here is unclear as to the specific legal bases under which the loss of consortium claim is brought. (*See* Am. Compl. ¶¶ 60-62.) Construing the matter in the light most favorable to Ms. Dixon, as required on a motion for summary judgment, *see Weinstock*, 224 F.3d at 41, the court assumes that her loss of consortium claim is being brought pursuant to § 1981, Title VII, and the New York State and City Human Rights Laws, i.e., all the statutes upon which the plaintiff relies in prosecuting his claims.

The law in this circuit is clear, however, that a claim for loss of consortium is not cognizable under these statutes. *See Stoczynski v. Verizon Commc'ns, Inc.*, No. 04-CV-864A, 2006 WL 3030781, at *3 (W.D.N.Y. Oct. 20, 2006) ("It is established within the Second Circuit . . . that a consortium claim can not be predicated on either a Title VII or New York HRL claim.") (citing *Moss v. Stinnes Corp.*, 169 F.3d 784, 785 (2d Cir. 1999)) (additional citations omitted); *Burrell v. AT&T Corp.*, No. 03 Civ. 2490, 2005 WL 3656124, at *3, n.45 (S.D.N.Y. Oct. 18, 2005) ("It is clear that federal courts do not recognize [loss of consortium] claims based on federal civil rights violations. Accordingly, plaintiff's section 1981 claim is dismissed.) (citing *Simpson v. Vacco*, No. 96 Civ. 3916, 1998 WL 118155, at *7 (S.D.N.Y. Mar. 17, 1998)) (additional citations omitted); *Goldman*, 131 F. Supp. 2d at 427 ("Courts have been unanimous in holding that . . . 'a spouse cannot state a cause of action for loss of consortium under [New York State's Human Rights Law]." (quoting *Murphy v. Cadillac Rubber & Plastics, Inc.*, 946 F. Supp. 1108, 1125 (W.D.N.Y. 1996)); *Mohamed*, 905 F. Supp. at 159 (no loss of consortium

claim stated under New York State and City Human Rights Law).  The plaintiffs do not seem to dispute this and have produced no cases which hold to the contrary.

The defendants also argue that summary judgment is warranted on the loss of consortium claim because the plaintiffs have failed to file a notice of claim, a procedural requirement proscribed under section 50-e and 50-i of New York's General Municipal Law.  *See Kreutzberg v. County of Suffolk*, No. 04-CV-3835, 2006 WL 3370351, at *3-4 (E.D.N.Y. Nov. 20, 2006) (dismissing a series of state law claims including one for loss of consortium because of plaintiffs' failure to file a timely notice of claim); *Dusenbury v. City of New York*, No. 97 CIV. 5215, 1999 WL 199072, at *2 (S.D.N.Y. Apr. 9, 1999) ("Despite the fact that her loss of consortium claim is derivative of her husband's negligence claim, it is still an independent claim which must meet the New York State General Municipal Law 50-e and 50-i notice requirements.") (citations omitted).  The plaintiffs have not disputed this assertion, nor have they countered with any legal arguments that would prevent the grant of summary judgment despite a failure to file a notice of claim, *cf. Warner v. Vill. of Goshen Police Dep't*, 256 F. Supp. 2d 171, 175 (S.D.N.Y. 2003) (noting that plaintiff could have applied to state court for leave to file late notice of claim but failed to do so).  Accordingly, summary judgment is warranted on Ms. Pauline Dixon's loss of consortium claim as it relates to § 1981, Title VII, and the New York State and City Human Rights Laws.

## CONCLUSION

For the foregoing reasons, the court respectfully recommends that the defendants' motion for summary judgment be granted in part and denied in part.

\*          \*          \*          \*          \*          \*          \*

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court with a copy to the undersigned within 10 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298 (2d Cir. 1992), *cert. denied*, 113 S. Ct. 825 (1992); *Small v. Secretary of Health and Human Serv.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

**The plaintiff's counsel is directed to serve a copy of this report and recommendation on the defendant by regular mail at its usual place of business and to file proof of service in the record.**

*Viktor V. Pohorelsky*
VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated: Brooklyn, New York
      September 14, 2007